**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| **ERIC MACALPINE; and BRIAN HICKERSON individually and on behalf of all others similarly situated**, <br><br>       **Plaintiffs,** <br><br> **v.** <br><br> **ONNIT LABS, INC.,** <br><br>       **Defendant.** | **Case No. 1:24-cv-00933-DII** |

**DEFENDANT ONNIT LABS, INC.'S MEMORANDUM IN SUPPORT OF
<u>MOTION TO DISMISS THIRD AMENDED CLASS ACTION COMPLAINT</u>**

Adam Bowser (VA Bar No. 76523)
ArentFox Schiff LLP
1717 K Street, N.W.
Washington, D.C. 20006
Ph: 202.857.6000
Fax: 202.857.6395
adam.bowser@afslaw.com


Counsel for Defendant
*Onnit Labs, Inc.*

August 29, 2025

Plaintiffs' amendment to their Complaint accomplished only one thing: they made it transparently clear that the entire factual basis for this case is logically groundless. Onnit respectfully asks that before the Court proceeds any further, please stop and review the screenshot included in Paragraph 94 of the Complaint. Now focus on the left-hand side of the screenshot. What is that? It's a **blank order form** to complete a "purchase" that admittedly has **not** been made. Compl. ¶ 94. Yet Plaintiffs then go on to assert that the otherwise incomprehensible metadata string associated with this website activity – before any purchase could have been made – somehow reveals that a purchase of a specific video *was made*. *Id.* ¶ 98. Simply put, one does not need to be a computer science major to understand that this is logically impossible: metadata about a "purchase" that *hasn't* been made **cannot** be evidence of a "purchase." Any website visitor at this stage could stop at anytime. Just like the Court could here – Plaintiff's theory is facially illogical and their claims should be dismissed with prejudice.

For the avoidance of doubt, Onnit first establishes below that Plaintiffs have not, and cannot, allege that they suffered any concrete injury that provides them standing here. Onnit then demonstrates that Plaintiffs fail to state a claim because (1) Onnit is clearly not disclosing that any video purchases are in fact being made, (2) Onnit's alleged disclosures to a limited number of vendors for Onnit's marketing purposes fall within the "ordinary course of business" exception, and (3) Onnit's sale of videos available to be streamed online does not make Onnit a "video tape service provider" subject to the Video Privacy Protection Act ("VPPA").

## ARGUMENT

## I.     PLAINTIFFS LACK ARTICLE III STANDING

### A.     Legal Standard

A motion to dismiss under Rule 12(b)(1) disputes the existence of the Court's subject-matter jurisdiction. When considering a jurisdictional challenge, the Court is not limited to facts

pled in the complaint and may consider "affidavits, testimony, or other evidentiary materials." *Paterson v. Weinberger,* 644 F.2d 521, 523 (5th Cir. 1981)). "[A] plaintiff is also required to submit facts through some evidentiary method and has the burden of proving by a preponderance of the evidence that the trial court does have subject matter jurisdiction." *Id.*

To have standing under Article III of the U.S. Constitution, Plaintiffs must allege they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins,* 578 U.S. 330, 338 (2016). To meet the first requirement, they must allege they have suffered a "concrete - that is, real, and not abstract" injury that has a "close historical or common-law analogue" "traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion LLC v. Ramirez,* 594 U.S. 413, 424-25 (2021) (internal quotation marks omitted). Because standing is a constitutional requirement, a court faced with a challenge to standing must resolve that issue before proceeding further with the case. *Nuziard v. Minority Bus. Dev. Agency,* 721 F. Supp. 3d 431, 452 (N.D. Tex. 2024) (citing *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 559-60 (1992)).

"For standing purposes ... an important difference exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law. Congress may enact legal prohibitions and obligations. And Congress may create causes of action for plaintiffs to sue defendants who violate those legal prohibitions or obligations. But under Article III, an injury in law is not an injury in fact. Only those plaintiffs who have been *concretely harmed by* a defendant's statutory violation may sue that private defendant over that violation in federal court." *TransUnion,* 594 U.S. at 426-27; *see also Perez v. McCreary, Veselka, Bragg & Allen, P.C.*, 45 F.4th 816, 822-

824 (5th Cir. 2022) (recognizing that its prior precedent "can't be squared with *TransUnion*," and reversing district court order finding plaintiff had standing when her claim was not "analogous to the tort of intrusion upon seclusion.").

**B.      Plaintiffs Have Not Suffered An Injury-In-Fact Close To A Common Law Analogue**

Here, even leaving aside that the Pixel metadata identified by Plaintiffs logically cannot evidence a purchase of specific video content when it clearly exists **before any purchase**, a business-to-business disclosure of metadata – at best, a *private* disclosure of private facts – is simply different in kind than any claim actionable at common law. Indeed, business-to-business disclosures have never been actionable at common law for multiple reasons. Separately, Plaintiffs do not, because they cannot, allege that they had a reasonable expectation of privacy in metadata associated with their visit to a commercial website on the public Internet being disclosed to Onnit's website vendors. Nor do they allege that the information allegedly disclosed – workout videos – is remotely sensitive and its disclosure would be highly offensive to reasonable person, let alone offensive at all.[1]  Rather, Plaintiffs conclusorily assert that they have a "statutorily conferred interest" in keeping this information private – as they are visiting a commercial website on the public Internet while logged into their Facebook accounts. This case does not remotely involve a concrete injury that should be clogging the Court's docket, and should be dismissed solely for lack of standing.

**1.      The Harms Congress Sought To Address Through The VPPA Are Not Remotely Implicated Here, And In Fact, Congress Expressly Permitted These Business-To-Business Disclosures At Issue**

---

[1] "Adam, have you been working out?" "No, why would you think that?" – said no guy ever. Of course, this is silly. Tens of millions of Americans work out in public gyms every day. While Covid certainly increased home workout routines, that doesn't change the fact that the *subject matter* at issue is entirely commonplace and not remotely sensitive. Plaintiffs don't allege otherwise.

As the Court has already recognized, the VPPA was enacted in response to a local newspaper publishing Judge Robert Bork's private video rental history in an effort to publicly embarrass him during his confirmation hearings.  ECF No. 26 at 5-6.  In short, it was these efforts to embarrass consumers by *publicizing* their private video-tape viewing history that spurred Congress to pass the VPPA to prevent this kind of weaponized disclosures to the public.

In contrast to such public disclosures of private facts, Congress expressly exempted any disclosure of personally identifiable information "to any person if the disclosure is incident to the ordinary course of business of the video tape service provider."  18 U.S.C. § 2710(b)(2)(E).  Congress defined "ordinary course of business" to mean "debt collection activities, **order fulfillment, request processing**, and the transfer of ownership."  *Id.* at § 2710(a)(2).  And importantly here, Congress expressly intended that this "ordinary course of business" exception "allows disclosure to permit video tape service providers to use mailing houses, warehouses, computer services, and similar companies for **<u>marketing to their customers</u>**. ***These practices*** are called '**order fulfillment**' and '**request processing**.'"  S. REP. 599, 12, 1988 U.S.C.C.A.N. 4342-1, 4342-10 (emphasis added).

Congress thus directly addressed – and exempted from any liability – the exact activity Plaintiffs are complaining about here: Onnit's alleged sharing of information with a limited number of vendors that provide Onnit "tracking, marketing, and advertising services."  Compl. ¶¶ 76, 112, 132, 149, 160, 162.  In short, while these allegations simply fail to state a claim under the "ordinary course of business" exception, just as critically here, they also fail to establish any concrete harm necessary for Article III standing – precisely because "Congress *didn't* elevate the" disclosure of PII to another business for marketing purposes as "a legally cognizable injury in the [VPPA]."  *Perez*, 45 F.4th at 826.  This alone should end the standing analysis under *TransUnion*

and *Perez*, but for good measure, Onnit details below that such business-to-business disclosures were never a harm recognized under common law.

### 2. Business-to-Business Disclosures Were Not Actionable At Common Law And Do Not Cause Any Concrete Harm Required For Standing

On standing, the Supreme Court's precedent makes clear that intangible harms don't count as concrete if they lack an element "essential to liability" at common law. *TransUnion*, 594 U.S. at 434. At common law, non-public disclosures weren't actionable—indeed, the only *distant* common law tort Plaintiffs could point to here is *public* disclosure of private facts. But critically, American tort law didn't allow plaintiffs to sue for disclosures of their personal information unless the disclosures were both outrageous *and* made to the public at large, rather than to a few individuals. *See* Restatement (Second) of Torts § 652D cmt. a (Am. L. Inst. 1977).[2]

Because Article III standing requires the plaintiff to allege an injury with "a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts," *TransUnion*, 594 U.S. at 424, the Third, Seventh, Tenth, and Eleventh Circuits have all held that consumers cannot bring federal statutory claims challenging private, business-to-business disclosures. *See Barclift v. Keystone Credit Services, LLC*, 93 F.4th 136, 145 (3d Cir. 2024); *Nabozny v. Optio Solutions LLC*, 84 F.4th 731, 733 (7th Cir. 2023); *Shields v. Professional Bureau of Collections of Maryland, Inc.*, 55 F.4th 823, 827 (10th Cir. 2022); *Hunstein v. Preferred Collection & Management Services, Inc.*, 48 F.4th 1236, 1240 (11th Cir. 2022) (*en banc*). Although these courts used different methodologies, they all reached the same conclusion: that

---

[2] *See also Lowe v. Hearst Commc'ns, Inc.,* 414 F. Supp. 2d 669, 673 (W.D. Tex. 2006), *aff'd,* 487 F.3d 246 (5th Cir. 2007) ("To establish the tort of invasion of privacy based upon the public disclosure of private facts, the plaintiff must demonstrate that (1) publicity was given to matters concerning his private life, (2) the publication of which would be highly offensive to a reasonable person of ordinary sensibilities, and (3) the matter publicized was not of legitimate public concern.").

business-to-business disclosures are fundamentally unlike the public disclosures actionable at common law, and thus do not cause the kind of concrete harm Article III requires.

Start with the Eleventh and Seventh Circuits. Those courts hold that consumers don't suffer concrete harm from disclosures of their information between businesses because such claims cannot satisfy the public disclosure tort's publicity element. In *Hunstein*, a consumer sued a debt collection agency alleging that the agency violated the Fair Debt Collection Practices Act (FDCPA) by disclosing the consumer's debts to its mail processing vendor. 48 F.4th at 1240. The plaintiff argued that the debt collector's disclosure "caused him a concrete injury because it was analogous to the common-law tort of public disclosure." *Id.* The *en banc* Eleventh Circuit disagreed. Analyzing the Supreme Court's decisions in *TransUnion* and *Spokeo*, the court held that consumers lack standing to bring statutory claims "when an element 'essential to liability' at common law is missing from [their] alleged harm." *Id.* at 1244; *see also id.* at 1252 (Pryor, C.J., concurring) (reasoning that "there is no concrete injury" under *TransUnion* "if an element whose presence is necessary for the plaintiff's traditionally recognized injury is absent").

That holding, the court recognized, made the standing analysis an "exercise in simplicity." *Id.* at 1245 (majority opinion). The public disclosure tort does not reach "communications that are private rather than public." *Id.* at 1245-46. "Instead, it requires that a matter be 'made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.'" *Id.* at 1246 (quoting Restatement (Second) of Torts § 652D cmt. a). Since the consumer's theory of injury thus "lack[ed] a necessary element of the [public disclosure] tort—the requirement that the disclosure be public," it was not concrete enough to confer Article III standing. *Id.* at 1240. The Seventh Circuit followed the Eleventh Circuit's approach in *Nabozny*, a "materially identical" case. 84 F.4th at 735. There too,

since the consumer's theory of injury thus "lack[ed] a necessary element of the [public disclosure] tort—the requirement that the disclosure be public," it was not concrete enough to confer Article III standing. *Id.* at 1240.

The Tenth and Third Circuits likewise held that consumers suffer no concrete injury from private disclosure of their personal information from one business to another, because private disclosures do not cause the same *kind* of harm as the public disclosures that are actionable at common law. That is, under the Tenth Circuit's analysis in *Shields*, the plaintiff's "alleged harm"—"that one private entity (and, presumably, some of its employees)" learned her private information—was not sufficiently similar to any harm recognized at common law. *Shields*, 55 F.4th at 829. The plaintiff's claim "**alleged private—not public—disclosure**," and thus did not assert "the same kind of harm as public disclosure of private facts, which is concerned with highly offensive information being widely known." *Id.* (emphasis added).

Applying the Tenth Circuit's harm comparison approach, the Third Circuit likewise held that a consumer failed to allege a concrete injury and thus lacked standing in another case claiming that a business-to-business disclosure violated a statutory "privacy" right. The court reasoned that "the harm" recognized by the public disclosure "tort is 'the humiliation that accompanies the disclosure of sensitive or scandalizing private information to public scrutiny.'" *Barclift*, 93 F.4th at 145-46. Business-to-business "disclosures that remain functionally internal are not closely related to those stemming from public ones," the court explained, because communications between businesses are "unlikely to result in the type of humiliation associated with the traditional injury." *Id.* at 146 & n.4.

These four post-*TransUnion* appellate decisions all directly address the exact "harm"

Plaintiffs are complaining about here – Onnit's alleged *private* disclosure of private "facts."[3]  And each of these courts found the plaintiffs lacked standing, either because an essential element of a common law claim was missing, or because the "harm" was different in kind, not degree.[4]  Either way, the outcome was the same – and it should be the same result the Court reaches here: Plaintiffs cannot have standing for these VPPA claims after *TransUnion*.

### 3.    Plaintiffs Do Not Have A Reasonable Expectation Of Privacy In Their Activity On A Commercial Website

Grounded in the Third-Party Doctrine,[5] there is a distinct strain of standing authority holding that there can be no reasonable expectation that metadata collected when visiting a commercial website is *not* being shared with third parties.  That's because when one accesses a website, personally identifiable metadata like IP addresses, browser activity and webpages viewed are inherently transmitted not only to the website operator, but numerous third parties along the

---

[3] As detailed below, the Meta Pixel does not remotely work like Plaintiffs believe it does – and that *should* already be obvious to them from their own screenshots. The fact is that Onnit sends **non-product-identifiable** product IDs associated with certain events, such as a purchase, which do not tell Meta what the person is purchasing at all – let alone a specific video title.

[4] While not addressed by these decisions, there is a distinct, but similarly fundamental reason why these claims would never be actionable at common law.  And that's because it is hornbook law that companies can disclose information, even potentially defamatory information, to an independent contractor if done as part of the company's normal business operations.  *See Burch v. Coca-Cola Co*., 119 F.3d 305, 323 (5th Cir. 1997) (recognizing that company has qualified privilege to communicate even misinformation under Texas law to contractor).  And this qualified privilege between a company and independent contractors simply extends even older common law agency principles.  *See Goldstein v. Union Nat. Bank*, 109 Tex. 555, 565, 213 S.W. 584, 589 (1919) ("There is a full and complete merger of identity, a oneness in action and knowledge, of principal and agent."); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 1917, 2016 WL 7805628, at *14 (N.D. Cal. Aug. 4, 2016) (the agent "stands in the shoes of the principal on matters within the scope of the agency."), *rev'd and remanded on other grounds*, 720 F. App'x 835 (9th Cir. 2017); *Hooker v. Wanigas Credit Union*, 835 F. App'x 110, 112 (6th Cir. 2021) ("agents stand in the place of their principals") (citing RESTATEMENT (THIRD) OF AGENCY § 1.01 (AM. L. INST. 2006)).  In short, providing information to vendors like Meta or Google to assist Onnit's business – which is what Plaintiffs are alleging – would not be an actionable "harm" at all under the common law.

[5] *See, e.g., Smith v. Maryland*, 442 U.S. 735, 743-44 (1979) (holding no legitimate expectation of privacy in data turned over to third party telephone company).

way – such as Google if one is using the Google Chrome browser, your ISP, and the numerous other service providers like Amazon Web Services that make up the public Internet.

Based on this, courts routinely hold that information concerning a person's website activity is simply not subject to a legitimate privacy expectation, including the Fifth Circuit.  For example, in *United States v. Weast*, 811 F.3d 743, 747 (5th Cir. 2016), the court held that the defendant had no reasonable expectation of privacy because "Weast had already voluntarily shared all of the information at issue in this case. He broadcast his IP address far and wide in the course of normal internet use … ."  Given this, "federal courts have uniformly held" that information "provided to an internet provider, including IP addresses, is not protected by the Fourth Amendment's privacy expectation because it is voluntarily conveyed to third parties."  *Id.*; *see also United States v. Halgren,* No. SA-16-CR-008-XR, 2017 WL 3741558, at *3 (W.D. Tex. Aug. 30, 2017) (same); *United States v. Forrester*, 512 F.3d 500, 509 (9th Cir. 2008) (holding that even if someone had a *subjective* expectation of privacy in the data associated with their website activity, "it would not be one that society is prepared to recognize as reasonable"); *United States v. VanDyck*, 776 F. App'x 495, 496 (9th Cir. 2019) ("internet users have no expectation of privacy in the IP addresses of the websites they visit").

Here, it bears emphasizing that the information at issue in these cases allowed the government – without a warrant – to identify a specific person *and* the specific content they were viewing on a website – often (illegal) video content.  And it should be an obvious point that our Constitutional framework is built around protecting citizens ***first and foremost from government*** invasions of privacy. *See* U.S. Const. amend. IV.  Point being, if it's uniformly held that there is no reasonable expectation of privacy that could prevent the federal government from finding out exactly what videos someone is watching on the Internet (and then locking them up for life), then

it is that much more unreasonable to claim that there's a legitimate invasion of privacy here.

For the avoidance doubt, courts also "consistently extend[] this [Fourth Amendment] reasoning to alleged injuries to privacy in the civil context in analyzing whether there is an injury under Article III." *Khamooshi v. Politico LLC*, No. 24-CV-07836-SK, 2025 WL 1408896, at \*3 (N.D. Cal. May 13, 2025) (collecting cases). And in analogous data analytics cases asserting statutory invasions of privacy, both the Ninth and Eighth Circuits independently ruled recently that allegations that a website collects and shares information regarding an individual's visit fails to establish any "injury in fact that is concrete, particularized, and actual or imminent." *See Daghaly v. Blommingdales.com, LLC*, 2024 WL 5134350, \*1 (9th Cir. Dec. 17, 2024); *Jones v. Bloomingdales.com, LLC*, No. 23-3304, 2024 WL 5205528, at \*4 (8th Cir. Dec. 24, 2024) ("We do so not because we think she experienced only a slight invasion of her privacy, ... but because her allegations do not plausibly suggest that she suffered **any such invasion at all**.") (emphasis added); *see also Rodriguez v. Autotrader.com, Inc.*, 762 F. Supp. 3d 921, 927 (C.D. Cal. 2025) (holding that in order to have an injury under statutory privacy violation, "the information must be sufficiently personal or sensitive that its disclosure is harmful"); *Saeedy v. Microsoft Corp.*, No. 23-CV-1104, 2023 WL 8828852, at \*4 (W.D. Wash. Dec. 21, 2023) (dismissing statutory privacy claims against Microsoft because "[d]ata and information that has been found insufficiently personal includes ... **interactions on a website**, search words typed into a search bar, user/device identifiers, and **website browsing activities**") (emphasis added); *Moore v. United Parcel Serv., Inc.*, No. 18-cv-07600-VC, 2019 WL 2172706, at \*1 (N.D. Cal. May 13, 2019) ("[A] reference to invaded 'privacy and statutory rights' . . . [is] insufficient to describe a concrete and particularized harm."); *Parker v. Salvation Army*, No. 20-CV-08585-JSW, 2021 WL 6618584, at \*2 (N.D. Cal. Apr. 16, 2021) (same).

But that is all Plaintiffs do here too – they allege in passing the most conclusory "injury" possible: Onnit allegedly violated their "rights under the VPPA and invaded [their] statutorily conferred interest in keeping such information (which bears on his personal affairs and concerns) private." Compl. ¶ 27. That is the full extent of Plaintiff's purported "harm." What they do *not* allege, even under their misunderstanding of how these technologies work, is that "such information" – workout videos – are remotely sensitive, embarrassing or they would suffer *any* harm if someone learned that they work out.[6] Nor do they lodge *any* allegation even suggesting that anyone has actually done anything with this data. *See TransUnion*, 594 U.S. at 434 & n.6 (holding that objectionable information not read "does not harm anyone").

In short, Plaintiffs seek to recover for a speculative non-injury after purchasing workout videos that are not remotely sensitive on the public Internet from an online retailer – one that has a detailed privacy policy[7] *and* the ability to easily opt out and/or delete data that was collected and

---

[6] That's one of the main reasons people do work out: so other people *know* they work out when they are in public. This is clearly a "gotcha" claim devoid of any actual injury. But another reason why these data analytics cases can't satisfy Article III requirements is that whether someone buys a video or not, the fact that you're visiting Onnit's website – which is exclusively focused on health and fitness – would already indicate someone is interested in health and fitness. For example, if someone purchases a physical kettlebell from Onnit, but not the kettlebell video, people will still (obviously) deduce you are going to work out with a kettlebell. Point being, even under Plaintiffs' misunderstanding of how the analytics technology works, third parties would still obtain the same information about you either way: you are going to work out with a kettlebell. Thus, there is independently no causal connection between the "injury" and the purported violation. *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 ("there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant'"); *see also Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1264 (11th Cir. 2019) (holding if a plaintiff "would have been injured in precisely the same way even if the [defendant] had not engaged in the conduct that he claimed was unlawful," there can be no "standing because of the failure to trace the injury to the unlawful conduct." *Id.* at 1271-72.

[7] *See* https://www.onnit.com/policies/privacy-policy (expressly disclosing that "commercial information, such as shopping history" may be disclosed to "business partners; online advertising networks; analytics vendors; and social media networks"); *see also People v. Nakai*, 183 Cal. App. 4th 499, 518, 107 Cal. Rptr. 3d 402, 418 (2010) (holding that there was no reasonable expectation of privacy when "the Yahoo! privacy policy indicated that chat dialogues" could be shared with

shared.[8]  But as courts consistently hold *without such disclosures*, there can be no standing here because Plaintiffs cannot have a reasonable expectation of privacy as a matter of law.

**4.      No Video Purchase Information Is Disclosed In Any Event**

As detailed above, the Court can and should dismiss this case for lack of standing on Plaintiffs' allegations alone.  And to put a finer point on it, the Court should reach this result *even* under Plaintiffs' clearly erroneous understanding that the identified metadata evidences a specific video purchase.  But here, Plaintiffs' lack of Article III standing becomes even more glaring once we start to peel back the layers of Plaintiffs' misunderstanding of how these data analytics technologies actually work.

Start with their own allegations.  It is transparently obvious from just the screenshots included in the Complaint that this metadata logically cannot evidence a purchase of a specific video title **when they have <u>not</u> purchased it.**  *See* Compl. ¶ 94 (including screenshot of **blank** form to be completed before any purchase, along with express allegations that associated metadata "appears after a customer has added the 'Onnit 6 – Hydrocore (Digital)' video to their 'Bag'," but *before* a purchase, if any).   And just as importantly, the *same* "metadata gibberish" appears both **before *and* after** the screenshot associated with what appears to be a confirmed purchase.  *See id.* ¶ 116.  Simply put, one does not need to learn to code to understand that this metadata cannot mean what Plaintiffs are claiming it means, if the same metadata appears **both** before *and* after a video purchase – **if any**.  Thus, just from basic logic, Plaintiffs' "smoking gun" is anything but, because everyone can see the gun hasn't been fired.

Not that more proof is needed, but the **same "checkout" metadata** Plaintiffs incorrectly

---

third parties).

[8]      *See*      https://unilever-privacy.my.onetrust.com/webform/fb530312-8ed8-4500-b6a6-5aaf40028e65/477c8e44-b57b-4d37-ac26-7ddd70e1aa28.

-12-

claim shows that the "Hydrocore" video has been purchased can be replicated – **but with a non-video product as the only item in the shopping cart**. *See* Welch Decl., ¶¶ 2-5, Ex. A. If the same metadata appears both before and after a *potential* video purchase, *and* the same metadata is being sent when no video at all is in the shopping cart, then it's obvious that this data cannot possibly evidence the purchase of a specific video title.

The fact is that, as detailed in Onnit's discovery responses served before Plaintiffs filed their current Complaint, Onnit's website is programmed to convey a **random numeric code** assigned to a particular item – but which does not identify what that individual is in the process of purchasing. *Id.*, Ex. B (Response to Interrogatory No. 2). That is, Onnit does not disclose what that item ID is associated with, i.e., whether it is a supplement, a kettlebell, a t-shirt, or a video – let alone the specific video title. *Id.* What gets transmitted is that product "6665" was purchased. Nothing remotely sensitive is actually being sent, let alone any data implicating the VPPA. While the Court does not need to consider anything outside the Complaint to understand that Plaintiffs fundamentally misunderstand these data flows, the limited material detailed above simply reinforces that Plaintiffs have not suffered *any* injury, whether as alleged or in reality. Plaintiffs Complaint should be dismissed with prejudice.

## II.    PLAINTIFFS FAIL TO STATE A CLAIM

As established in the context of standing, Plaintiffs' own allegations and screenshots make clear that (1) the identified metadata logically cannot evidence that any specific video was in fact purchased, given that it admittedly exists *before* any purchase, and (2) Onnit's disclosure of metadata to its vendors *for its own marketing* purposes falls within the "ordinary course of business" exception. In short, by going the full-monty route in their latest Complaint, Plaintiffs have removed any doubt that this is a factually meritless case and have pled themselves out of Court. *See U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 377 (5th Cir. 2004)

(holding that if "an allegation is contradicted by the contents of an exhibit attached to the pleading, then indeed the exhibit and not the allegation controls").  While these grounds are sufficient in themselves to dismiss the Complaint with prejudice under Rule 12(b)(6), Onnit also establishes below that the VPPA should not apply to streamed content.

### A.   The Metadata At Issue Clearly Does Not Evidence, Let Alone To An Ordinary Person, That A Specific Video Was Purchased

Onnit thoroughly established above that the new allegations and screenshots Plaintiffs added to their Complaint are ultimately self-defeating.  Indeed, the Court's original order was expressly predicated on Plaintiffs' "alleg[ations] that the Private Viewing Information constitutes 'the specific videos that a particular person **purchased** on Defendant's Website.'"  ECF No. 26 at 3 (emphasis added).[9]  Now, likely in response to Onnit's Counterclaim detailing how their prior allegations about the website were inaccurate, Countercl. ¶¶ 16-19, Plaintiffs "supplemented" their allegations in a way that removes any doubt that Onnit's website does <u>not</u> operate in a way that discloses that specific video titles were in fact purchased.

In addition to Plaintiffs' allegations materially changing, the Second Circuit has now also joined the Ninth and Third Circuits in adopting the prevailing "ordinary person" VPPA standard, but doing so in a way that addressed Plaintiffs' exact metadata theory here head on – and finding it failed as a matter of law.  *See Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 46 (2d Cir. 2025).[10]  That was because the "Request URL" string of metadata Plaintiffs rely on here is "information

---

[9] The Court's prior Order focused on whether someone's Facebook ID personally identified the individual, which the Court ultimately held was a factual dispute "[w]ith respect to Plaintiffs MacAlpine and Gremmo's Facebook profile statuses."  *Id.* at 9 n.1.  The issue presented here, however, is distinct and involves the other half of "personally identifiable information" under the VPPA.  18 U.S.C. § 2710(a)(1).  That is, it's not whether a Facebook ID personally identifies the Plaintiffs, but that the new metadata allegations (clearly) do not identify that a specific video was purchased.

[10] The Court's original Order relied on multiple Second Circuit district court decisions. ECF No. 26 at 7-8.  Of course, *Solomon* supersedes these decisions to the extent of any conflict.

that only a sophisticated technology company could use" "to identify a consumer's video-watching habits." *Id.* at 52. Or as a subsequent Second Circuit panel put it, "*Solomon* effectively shut the door for Pixel-based VPPA claims." *Hughes v. National Football League*, 2025 WL 1720295, *2 (2d Cir. June 20, 2025). In sum, the Second Circuit correctly concluded, twice now, that no ordinary person could look at the same type of metadata string relied on by Plaintiffs here and possibly understand it – and thus it cannot be personally identifiable information (PII).

Notably, the Second Circuit held this assuming that the video title identified in the metadata string was *necessarily obtained* by the consumer. *Solomon*, 136 F.4th at 45-46 ("**every time** a FITE consumer **accesses a video**" "the specific title of the video that the user accesses" is included in the metadata string) (emphasis added). Here by contrast, that is clearly not the case – as Plaintiffs own allegations make clear that this metadata is sent independent of whether the video is purchased *or not*. Compl. ¶¶ 94, 117, 134, 151, 164. Again, in this case, such metadata cannot logically disclose to even an *extra*ordinary person whether someone in fact purchased a video from Onnit. "It merely indicates that [Plaintiffs] *could* access videos on the website. And that's not sufficient to bring [Plaintiffs] within the VPPA's reach." *Lovett v. Continued.com, LLC*, 2025 WL 1809719, *3 (S.D. Ohio July 1, 2025) (dismissing Plaintiffs' Counsel's VPPA complaint). Ultimately, the same facially deficient metadata allegations pervade Plaintiffs' entire Complaint, regardless of the analytics service at issue.[11] Accordingly, this is a much easier decision than

---

[11] Curiously, Plaintiffs add in the other alleged analytics service providers by attempting to bootstrap email addresses to the "FID is personally identifiable" theory. But the email address alleged, "myhonestreviews51@gmail.com," facially does not personally identify anyone, and Googling that email address yields **zero** results. This is personally *unidentifiable* information. Finally, it should also be noted that Onnit previously sold the Hydrocore Bag on its website. *See* https://www.onnit.com/blogs/the-edge/hydrocore-bag-training-for-an-unshakeable-body?utm_content=hydrocore_ag2amVxd7jM&utm_medium=organicsocial&utm_source=youtu be. The metadata string identified by Plaintiffs, however, does not plausibly even identify that one is viewing the webpage of the Hydrocore video, let alone purchasing it, **rather than the**

*Solomon* or *Hughes*: Plaintiffs' metadata theory underpinning their entire case logically cannot identify whether anyone obtained a video from Onnit or not.

### B.    Onnit's Disclosure Of Metadata To Data Analytics And Marketing Vendors Falls Within The "Ordinary Course Of Business" Exemption In Any Event

Plaintiffs' allegations make clear that Onnit does *not* disclose PII as defined under the VPPA, and it cannot be violation of the statute on this ground alone.  But even if the information were PII – and it's not – its disclosure under the facts alleged would still not be actionable because such disclosures are exempted under the "ordinary course of business" exemption.  That is, the statute provides that "a video tape service provider may disclose personally identifiable information concerning any consumer … to any person if the disclosure is incident to the ordinary course of business of the video tape service provider."  *See* 18 U.S.C. § 2710(b)(2)(E).  And as already established, Congress expressly stated that disclosures for the purpose of "marketing to their customers" constitute "order fulfillment" and "request processing" included within the definition of "ordinary course of business."  S. REP. 599, 12, 1988 U.S.C.C.A.N. 4342-1, 4342-10.  Of course, that makes perfect sense, as a business analyzing activity on its own website and marketing to its customers is as "ordinary" as it gets.

And that's the exact activity Plaintiffs are complaining about here.  *See* Compl. ¶¶ 76, 112, 132, 149, 160, 162.  That activity is exempted from the scope of the VPPA, and for this independent reason, Plaintiffs have pled themselves out of Court.

### C.    Streaming Does Not Fall Within The VPPA

Imagine you run a small business in 2024 that offers a limited number of workout videos available for streaming.  You operate your website in full compliance with modern privacy laws –

---

**Hydrocore product**.  *See, e.g.*, Compl. ¶ 164 (leaving unexplained why "2Fsix-hydrocore%2F&hard_2…" would identify either the Hydrocore Bag or a distinct video).

such as the Texas Data Privacy and Security Act[12] and the California Consumer Privacy Act –

laws that specifically and comprehensively regulate online privacy issues and the exact

technologies at issue here, and which further give consumers control over data collected online,

including the right to opt out and delete their data.[13]  Further imagine that you have a detailed

Privacy Policy that's posted on every page of your website, it thoroughly details how your website

collects and uses data, *and* customers are agreeing that they "have read and acknowledge Onnit's

Privacy Policy" before making a purchase.  Compl. ¶ 94.  Then imagine someone sues you under

a **1980s** law called the "Wrongful disclosure of **video tape rentals or sale** records," claiming your

company is a "**video tape service provider**."  At this point, you would very likely conclude that

someone has lost the plot – and you'd be right.

Begin, as we must, with the definition of "video tape service provider."  That term means

a "person, engaged in the business … of rental, sale, or delivery of **prerecorded video *cassette***

***tapes*** or **similar** audio visual ***materials***."  18 U.S.C. § 2710(a)(4) (emphasis added).  The plain

English definition of material is – "relating to, derived from, or consisting **of matter**" – meaning

something physical.[14]  Thus, "similar audio visual materials" means audio-visual content stored

on a *physical medium* – just like a prerecorded video *cassette tape* specifically enumerated in the

definition.[15]  This conclusion is further supported by the VPPA's legislative history, which states

that the scope of the law was intended to cover the "rental, sale, or delivery of prerecorded video

---

[12]    *See, e.g.,*    https://www.texasattorneygeneral.gov/consumer-protection/file-consumer-complaint/consumer-privacy-rights/texas-data-privacy-and-security-act.

[13] *See, e.g.,* California Consumer Privacy Act (CCPA) | State of California - Department of Justice - Office of the Attorney General.

[14]    *See* https://www.merriam-webster.com/dictionary/material.

[15]    "Under the principle of *ejusdem generis,* where general words follow an enumeration of specific terms, the general words are read to apply only to other items like those specifically enumerated."  *United States v. Kaluza*, 780 F.3d 647, 660–61 (5th Cir. 2015) (internal citation omitted).

cassette tapes or similar audio visual materials, **such as laser discs, open-reel movies, or CDI technology**." *See* S. REP. 599, 12, 1988 U.S.C.C.A.N. 4342-1, 4342-10 (emphasis added). In other words, only audio-visual content stored on physical – material – media is potentially encompassed by this statute, and not *immaterial* content-delivery vehicles like streaming.

Plaintiffs may argue that streaming didn't exist in the 1980s. While that may be correct, it is also beside the point – because we know what did exist in the 1980s: cable television. And television has always been delivered, just like streaming services today, over-the-air or through a cable connection, just like Wi-Fi or fiber today are used to bring streaming content to Smart TVs, computers, smartphones and other digital devices. And just as critically here, cable television services *were already comprehensively regulated before* the VPPA – **expressly including privacy issues** – under the Cable Act. *See* 47 U.S.C. § 551 (1984 statute added to address "Protection of subscriber privacy" applicable to cable TV services). And not once did Congress, four years later, even hint that the VPPA would also apply to television content and cable operators. To be sure, no VPPA decision hints at that possibility either.

Thus, applying the VPPA to streamed content cannot be squared with the plain language of the statute, its legislative history, *or* its historical context. So how did we get here? The "fountainhead" case for extending the VPPA to streaming services is Magistrate Judge Beeler's decision *In re Hulu Priv. Litig.*, No. C 11-03764 LB, 2012 WL 3282960, at *5 (N.D. Cal. Aug. 10, 2012). And that decision rested on only two grounds:

> [1] The singular "material" is "matter" or the composition of something, but the plural "materials" means "the equipment necessary for a particular activity." [2] And, Plaintiffs observe, in its own terms of use, Hulu uses the words "video materials" to mean "content ... includ[ing] ... any text, graphics, layout, interface, logos, photographs, audio and video materials, and stills."

*Id.* In other words, Judge Beeler recognized that "material" necessarily is limited to

something comprised of physical matter, but she placed significance in the fact that the plural "materials" is used (which is easily explained by the fact that Congress used "cassette *tapes*" immediately before "materials"). But to test this construction, let's use the plural definition of "materials" in the *only* sentence that matters: a "video tape service provider" is a person "engaged in the business of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual [equipment necessary for a particular activity.]" With respect to Judge Beeler, that is a complete non-sequitur as applied to streaming content providers – because they do not sell, rent or deliver the "equipment necessary" for *any activity*. Simply put, that is a clearly erroneous interpretation, thus leaving us with Hulu using "materials" in its terms of use. And needless to say, there is no rule of statutory construction that would let Hulu's terms dictate national privacy law.

On just this rickety foundation, the case law equivalent of jumping off that bridge everyone's mother warns about started happening. *See Mollett v. Netflix, Inc.*, No. 5:11-CV-01629-EJD, 2012 WL 3731542, at *2 (N.D. Cal. Aug. 17, 2012) (citing *In re Hulu* as "the first court to squarely address the issue of whether the VPPA applies to streaming video providers decided—after a careful statutory analysis—that it does. … In any event, **Netflix does not challenge the allegations that it is a "video tape service provider"**) (emphasis added). Thus, without any independent analysis *or* dispute by Netflix – which *was* providing mail-order DVDs *at this time* – the VPPA decisions started taking it for granted that streaming was covered. That, unfortunately, is how bad law gets made.

As a needed course correction, however, the Second Circuit recognized that Congress decided *not* to update the "definition of personally identifiable information, even in the face of testimony asking for an expansion of the definition to include IP addresses" to address online activity. *Solomon*, 136 F.4th at 53. And that "decision to not amend the VPPA suggests that

Congress believed that the VPPA 'serves different purposes, and protects different constituencies, than other, broader privacy laws.'" *Id.* (citing *In re Nickelodeon*, 827 F.3d 262, 288). The same logic applies with equal force to Congress' decision *not* to update the definition of a "video tape service provider," which does not encompass streaming providers under its plain English meaning. Indeed, perhaps the biggest irony here is that the VPPA started with Judge Bork, and he would be the *last* judge in the world who want to see this statute (mis)interpreted just to keep up with changes in technology. In the end, that is for Congress to do – if it so chooses. *See Jones v. Blackstone Med. Servs., LLC*, No. 1:24-CV-01074-JEH-RLH, 2025 WL 2042764, at *5 (C.D. Ill. July 21, 2025) (recognizing that similar consumer protection statute does not encompass newer technologies, but holding the "Court confines itself to its assigned role which does not include legislating.").[16]

## **CONCLUSION**

For the foregoing reasons, Onnit respectfully requests that this Court grant its Motion and dismiss Plaintiff's Third Amended Complaint with prejudice.

---

[16]     *See also State v. Valerio*, No. A-1-CA-41515, 2025 WL 1621551, at *4 (N.M. Ct. App. June 6, 2025) ("any broadening of the conduct proscribed by [the statute] is a matter for the Legislature, not this Court.").

Dated: August 29, 2025

Respectfully Submitted,
**ARENTFOX SCHIFF LLP**


By: _____

Adam Bowser (VA Bar No. 1644196)
ArentFox Schiff LLP
1717 K Street, N.W.
Washington, D.C. 20006
Phone: 202.857.6000
Fax: 202.857.6395
adam.bowser@afslaw.com

*Counsel for Defendant,*
*Onnit Labs, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that pursuant to the Federal Rules of Civil Procedure 5, this 29th day of August 2025 I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Tyler K. Somes (DC Bar No. 90013925)
HEDIN LLP
1100 15th Street NW, Suite 04-108
Washington, D.C. 20005
Phone: 202.900.3332
Fax: 305.200.8801
tsomes@hedinllp.com

Frank S. Hedin (FL. Bar No. 109698)
Elliott O. Jackson (FL. Bar No. 1034536)
HEDIN LLP
1395 Brickell Ave., Suite 610
Miami, Florida 33131-3302
Phone: 305.357.2107
Fax: 305.200.8801
fhedin@hedinllp.com
ejackson@hedinllp.com

Matthew J. Langley (FL Bar No. 97331)
ALMEIDA LAW GROUP LLC
849 W. Webster Avenue
Chicago, Illinois 60614
Phone: 312.576.3024
matt@almeidalawgroup.com

_____
Litigation Senior Paralegal Specialist